In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1253

SHEILA RITCHIE,

Plaintiff-Appellant,

v.

GLIDDEN COMPANY, ICI PAINTS WORLD-GROUP
and GRACO, Inc.,

Defendants-Appellees.

Appeal from the United States District
Court for the Northern District of Indiana,
Fort Wayne Division.
No. 98 C 111--William C. Lee, Chief
Judge.

Argued September 19, 2000--Decided February
27, 2001

  Before Bauer, Manion, and Kanne, Circuit
Judges.

  KANNE, Circuit Judge.  Plaintiff-
appellant Sheila Ritchie suffered a paint
injection injury while operating airless
spray paint equipment that resulted in
the eventual amputation of her left index
finger. Ritchie brought a products
liability action against the manufacturer
of the pump, Graco, Inc. ("Graco"), as
well as against the owner and supplier of
the pump, Glidden Company, ICI Paints
World Group ("Glidden"), based on the
parties' failure to warn of the dangerous
nature of the high pressure airless pump
system. Graco and Glidden moved for
summary judgment, arguing that Ritchie
had not presented sufficient evidence to
meet all of the elements of her prima
facie case under the Indiana Products
Liability Act. The district court agreed
and granted summary judgment for both
Graco and Glidden. Ritchie appeals,
claiming that the district court erred in

finding that there was no issue of material fact regarding whether the pump involved in the accident left Graco's control without proper warnings. Because we find that genuine issues of material fact remain, we reverse and remand.

I.  History
A.  Ritchie's Injury

Redman Homes ("Redman") is a manufacturer of modular unit homes located in Topeka, Indiana. As part of their business of building modular homes, Redman paints the inside of the units prior to assembling them. On July 11, 1994, Redman hired Ritchie to perform touch-up painting of the modular units. A little over a year later Ritchie was moved to a spray painting position. As a spray painter, Ritchie applied paint to the interior surfaces of the units with airless spray painting equipment. The equipment that Richie used in her job as a spray painter is composed of three parts: a pump, a hose, and a spray nozzle/gun. The pump that Ritchie normally used was mounted on a fifty-five gallon drum that contained the paint. Ritchie had no previous experience using high pressure spray painting equipment and Redman did not provide any formal training. Ritchie learned how to operate the equipment solely by watching her co-workers. At no time prior to her accident did Ritchie receive any operating manuals or other safety information regarding the equipment.

On February 29, 1996, while using the airless spray equipment to paint the inside of a unit, Ritchie noticed that her pump was not working properly and heard her co-workers yelling that paint was "flying everywhere." She realized that she had lost pressure in her spray gun so she turned off the air pressure to the pump. Ritchie contacted her foreman, Reuben Brandenburger, to notify him of the problem. Brandenburger in turn contacted the maintenance crew. The maintenance crew advised him that they were too busy to immediately attend to the broken spray gun, so they asked him to determine whether the problem was with the hose or the pump. Brandenburger instructed Ritchie to check the hose for raw spots or holes while he checked the

pump. As Ritchie inspected the hose by running her hands over it and twisting it, Brandenburger turned on the pump and Ritchie felt a prick to her left index finger. She described the incident as follows:

While I was checking the hose, I was twisting, you know, and looking at it. I have no idea why he did it . . . . But he turned the pump on. I felt a prick to my left index finger. It felt more like a splinter, like I had poked it. I put it, like in the back of my mind saying 'I'll check it later.' I told Rubin, 'Yes, I know it's the hose. There's a hole in it.'

(Ritchie Dep. at 35).

When Ritchie went to wash her hands a few minutes later, she noticed that the pricked finger had a small hole in it and had turned white. She notified the assistant production manager, Tim Oesch, of the injection injury and asked him what she should do. Oesch asked her if it hurt, and Ritchie replied that it did not. Oesch called the personnel manager, and asked her if Ritchie should go to the doctor. The personnel manager replied that if the injury did not look too bad and Ritchie was not complaining about the pain then Oesch should just "forget about it." Oesch then suggested that Ritchie return to work which she did without complaint.

Approximately three hours after Ritchie's return to work, a co-worker notified Brandenburger that Ritchie's finger had swollen to almost three times its normal size. Ritchie was sent to the personnel office to fill out paperwork and to see Redman's worker's compensation doctor. Ritchie was unable to see the company doctor, so she drove herself to the emergency room at LaGrange Hospital. The doctor at LaGrange Hospital recognized the serious nature of Ritchie's injury and immediately sent her to Fort Wayne Orthopedics. After arriving at Fort Wayne Orthopedics, Ritchie was rushed into surgery. When the surgeon opened her finger, it was filled with paint. During surgery that lasted three and a half hours, the doctor first attempted to rinse and then attempted to

drain the paint out of her finger. When this was unsuccessful, he attempted to cut the paint out of her finger. Ritchie subsequently endured six more surgeries, but doctors were unable to save her finger from amputation.

B.  The Accident Pump

The origin of the pump that Ritchie was using at the time of the accident is disputed. Ritchie claims that the accident pump was supplied by Glidden immediately preceding the injury. The defendants, on the other hand, deny this. Patrick Cross, the General Manager of the Topeka facility, testified that Redman has no records showing the purchase, sale, lease, or ownership of the pump used by Ritchie on the date of the accident. Ritchie testified that she had been using the same type of pump since she began working as a spray painter, but she could not specifically identify the pump that she was using when the injury occurred./1 Redman continued to use the offending pump for a while after the accident, but its present whereabouts are unknown. Several witnesses, however, have testified that the accident pump was a Graco pump, and Graco does not dispute that fact for the purposes of this appeal.

Prior to May of 1994, various companies supplied paint, spray painting pumps, and other painting equipment to Redman. In May 1994, Glidden began supplying paint and painting equipment to Redman. Glidden does not manufacture painting equipment, but distributes brushes, rollers, hoses, pumps, and other painting equipment made by a variety of manufacturers. Tim Pieri, a Glidden sales representative, was responsible for the Redman account at all times relevant to this case. Redman's previous supplier provided Redman with spray painting pumps made by various manufacturers including Binks, Speedflo, and Graco. When Glidden first took over the account, Pieri continued to supply Redman with pumps made by various manufacturers.

At some point after Glidden became Redman's supplier, Redman decided to upgrade its painting equipment due to

frequent problems with the existing equipment. Because Graco pumps were thought to be the best in the industry, Redman determined that the existing pumps would be replaced by Graco pumps. Redman and Pieri came to an agreement whereby Redman would buy all of its paint from Glidden, and in exchange, Glidden would supply Redman with the necessary Graco pumps. At that time, Glidden was not an authorized dealer of Graco pumps, so Pieri purchased Graco pumps for Redman from Devoe Paints, an authorized Graco distributor. Glidden retained ownership of the pumps and was responsible for their periodic service and inspection, though Redman was responsible for day-to-day maintenance of the pumps. It is unclear whether Glidden had completed the pump upgrade at the time of Ritchie's accident. It is undisputed, however, that pumps manufactured by three different manufacturers were on the Redman premises at the time of Ritchie's accident.

In January 1996, Pieri supplied Redman with two new Graco Bulldog pumps. These two pumps arrived in crates, were unpacked by maintenance, and were set-up by Pieri with the assistance of Redman employee Hodgie Thulin. Graco denies that either of these pumps was the pump used by Ritchie at the time of her accident. Pieri claims that the two pumps that he delivered were cart-mounted pumps-- unlike the accident pump which was indisputably a drum-mounted pump. Cart mounted pumps are small, mobile pumps that Redman employees use primarily as back-up pumps when the drum-mounted pumps are being serviced or are not operable. Pieri did initially testify that the accident pump Ritchie used was one of the new pumps that he delivered in January. Upon learning that Ritchie described the accident pump as a drum-mounted pump, however, Pieri recanted. He then testified that if the accident pump was a drum-mounted pump then it was not one of the pumps that he had delivered in January.

In direct contradiction, Ritchie argues that the accident pump was one of the pumps that Pieri delivered in January. Ritchie claims that Pieri is incorrect in his assertion that he delivered cart-mounted pumps to Redman in January. She

bases this claim on the testimony of Richard Grooms, Redman's production manager. Grooms testified that the accident pump was a Graco Bulldog pump/2 brought in by Glidden as part of the upgrade of Redman's painting equipment. Ritchie also relies on the testimony of Thulin to show that the pumps that Pieri delivered were drum-mounted pumps. Thulin testified that only drum-mounted pumps are delivered in crates.

C.  Knowledge of Danger

   Although some Redman employees were aware of the specific danger of paint injection associated with the airless spray painting pumps, it seems that most employees' knowledge was limited to a general awareness that high pressure equipment can be dangerous. As noted earlier, Redman provided no formal training or safety instructions on the use of spray painting equipment and did not hand out copies of instruction manuals to the employees. Nor were employees informed of the importance of obtaining immediate medical attention in the event of an injection injury. Although Redman kept all of the pump instruction and safety manuals available in the maintenance room for employee perusal, Redman's Quality Process manager, Steve McCorkle, admits that Redman "did a poor job maybe of disseminating that information."

   Pieri, Glidden's account representative, knew of the dangers associated with the high pressure pumps. Specifically, he was aware that it was possible for a person to be injected with paint either by the hose or by the spray gun and that immediate medical attention would be necessary for anyone who suffered such an injury. Pieri included instruction manuals for the equipment he delivered, but he did not voluntarily provide any training to Redman employees regarding the proper use of the pumps.

D.  Presence of Warnings on Pumps

   It is disputed whether the pump that was involved in Ritchie's accident had a warning label affixed to it. William

Kullman, Graco's Product Safety and Compliance Administrator, maintains that all Graco equipment leaves Graco's control with on-product warning labels and accompanied by safety manuals. For example, the warning on a Graco pump similar to the one Ritchie was using on the day of her accident reads as follows:

WARNING - HIGH PRESSURE DEVICE FOR PROFESSIONAL USE ONLY - Read Instruction Manual Before Operating: Observe All Warnings.

INJECTION HAZARD - High pressure spray or application equipment can cause serious injury if the spray penetrates the skin. DO NOT point any high pressure device - gun or nozzle - at anyone or any part of the body. Do not attempt to deflect or stop leaks in the system by hand. In case of penetration, adequate medical aide must be immediately obtained.

. . . .

SERVICING - Before servicing, cleaning, or removing any part, always shut off power source, carefully release pressure in fluid portions of the system and set safety lock on guns and equipment.

With respect to the two pumps delivered to Redman in January 1996, Pieri was unable to remember whether he saw on-product labels on the pumps that he delivered.

Ritchie, however, did not see any warnings or labels on the pump that she was using at the time of the accident. Additionally, several of her co-workers do not recall seeing any warnings on the accident pump. Redman's quality process manager, McCorkle, stated that he saw neither identifying labels nor warning labels on the pump when he inspected it within twenty-four hours of the accident. In contrast, Redman's production manager, Oesch, testified that he believed the pump did have a vague warning label that said "High Pressure Pump."

Ritchie filed suit in Indiana state court against Graco and Glidden alleging that she was entitled to relief under various products liability theories including strict liability, negligence,

and breach of warranty based on the defendants' failure to warn her of possible dangers associated with the use of the pump./3 The defendants removed the case to federal district court. Graco and Glidden moved for summary judgment, arguing that Ritchie could not meet her burden under the Indiana Products Liability Act. The district court agreed and granted summary judgment for the defendants.

II.   Analysis
A.   Standard of Review

We review de novo a district court's grant of summary judgment, construing all facts and inferences in the light most favorable to the non-moving party. See Myers v. Hasara, 226 F.3d 821, 825 (7th Cir. 2000). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct 1348, 89 L. Ed. 2d 538 (1986).

B.   Applicable Law

As a federal court sitting in diversity, we apply state substantive law and federal procedural law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). Thus, Ritchie's failure to warn claims against both the pump manufacturer, Graco, and the pump supplier, Glidden, are governed by the Indiana Product Liability Act ("the Act"). See Ind. Code Ann. sec.sec. 33-1-1.5-1 to 33-1-1.5-10 (West 1996)./4 Ritchie also brings a claim against Glidden under the Restatement (Second) of Torts sec. 388 for negligent supply and maintenance of the accident pump.

In order to succeed on her failure to warn claim under the Act,/5 Ritchie must show the following: (1) the seller is engaged in the business of selling the product that caused the injury; (2) the product was defective and unreasonably dangerous; (3) the defect existed at the time the product left the defendant's control; (4) the product was expected to and did reach the consumer without substantial change in its condition; and (5) the defective product was the proximate cause of plaintiff's injuries. See Miceli v. Ansell, 23 F. Supp. 2d 929, 931-32 (N.D. Ind. 1998) (quoting Chambers v. Osteonics Corp., 109 F.3d 1243, 1247 (7th Cir. 1997)). The Act provides that a plaintiff can satisfy the second element--that the product was defective--by showing one of the following: a design defect, a manufacturing defect, or a failure to warn. See Moss v. Crosman Corp., 136 F.3d 1169, 1171 (7th Cir. 1998); Natural Gas Odorizing, Inc. v. Downs, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997). Ritchie bases her claims on Graco and Glidden's failure to warn of the danger posed by high pressure spray painting pumps.

In order to show that the pump that she was using at the time of her accident was defective, Richie must show that Graco had a duty to adequately warn her about a latent dangerous characteristic and failed to do so./6 See Natural Gas Odorizing, 685 N.E.2d at 161. Whether the defendants had a duty to warn Ritchie of the dangers posed by the spray painting pump is a question of law for the court to decide. See id. If Graco and Glidden did have such a duty, they will be liable under the act unless the pump included reasonably complete instructions and was properly packaged and labeled to warn users of possible dangers. See Ind. Code Ann. sec. 33-1-1.5-2.5(b). We will address Ritchie's claims against Graco and Glidden separately.

C.  Ritchie's Failure To Warn Claim Against Graco

The law in this case is clear. The facts on the other hand, are far from clear and are further obscured by both parties' attempts to mischaracterize the evidence.

Of course, disagreement about trivial matters is not enough to preclude summary judgment--"[o]nly disputes that might affect the outcome of the suit under our precedent will properly preclude the entry of summary judgment." Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 344 (7th Cir. 1999). Therefore, our task is to determine whether genuine issues of material fact exist in this case such that summary judgment would be improper.

Ritchie argues that she is entitled to recover for her injury because Graco failed to properly label its pumps to warn potential users of the danger of injection. Graco advances four arguments in response. Graco's first argument, and the one that found favor with the district court, is that Ritchie has not produced sufficient evidence to show that the pump left Graco's control without on-pump warnings. Second, Graco contends that Ritchie has not produced any evidence of a design defect and that there can be no duty to warn in the absence of such a defect. Third, Graco maintains that, by providing information and safety manuals to Redman, it has satisfied its duty to warn. Finally, Graco claims that the absence of warnings was not the proximate cause of Ritchie's injury. The district court was convinced by Graco's first argument, and thus did not express an opinion on the other three arguments. We will discuss each argument in turn.

1.  Presence of Warning Labels
When Pump Left Graco's Care and Control

In order to prevail on her failure to warn claim against Graco under the Act, Ritchie must show that the product in question was defective and that it was defective at the time it left the care and control of the defendant. Ritchie has certainly shown an issue of fact with respect to whether the product was in a defective condition at the time of her accident. Ritchie and several witnesses who observed the pump after the accident testified that it did not display any type of warning. For example, Redman employees Thulin and Brandenburger both testified that they did not remember seeing any type of warning on the pump Ritchie was using when the accident

occurred. McCorkle testified that he specifically inspected the accident pump and did not see a warning label. He also testified that the pump was not covered with paint in such a way that an existing label would be illegible.

In order to survive a motion for summary judgment, however, Ritchie must show a genuine issue of fact not only as to whether the accident pump was defective (i.e., lacked warnings), but also as to whether the defect existed at the time the product left Graco's control.  In addressing this issue, the district court properly recognized that the fact that several witnesses did not see warning labels on the accident pump on the day of the accident, when viewed in the light most favorable to Ritchie, leads to an inference that the pumps did not have warnings when they arrived at Redman's plant. According to the district court, however, this inference provides "merely a 'scintilla of evidence' which provides only 'some metaphysical doubt,' as to the material facts." Ritchie v. Redman Homes, No. 1:98 CV 111, at 14 (N. D. Ill. 1999) (quoting Matsushita Elec. Inds. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998)). Thus, the district court found that Ritchie failed to show that the pump lacked warnings at the time it left Graco's control and granted summary judgment for Graco.

We agree with the district court that the fact that the pump did not have warnings on it at the time of the accident is not, in itself, enough for a rational juror to find that the pump lacked warnings at the time it left Graco's care and control. However, while Ritchie can not meet her burden merely by asserting that the pumps did not have labels on the date of her accident, nor is she required to produce an eyewitness who saw the accident pump leaving Graco's plant without a warning. If Ritchie can show that the pump arrived new at Redman without warnings, it would be reasonable for a juror to infer that it left Graco in that condition.

In order to show that the accident pump arrived at Redman without warnings,

Ritchie must show that the accident pump was one of the two pumps that Pieri delivered in January. If the offending pump was not one of the pumps delivered in January, Ritchie clearly does not have sufficient evidence to show that the pump lacked warnings when it left Graco. Ritchie has put forth no evidence regarding the chain of custody of any pump other than the pumps delivered by Pieri in January of 1996. Without evidence of the events surrounding the arrival of the accident pump at Redman, it would not be reasonable for a juror to infer that it left Graco without warnings because a number of factors could account for missing warning labels. If, however, the accident pump was one of the two pumps delivered in January, a rational juror might find by a preponderance of evidence that the pump lacked warnings when it left Graco. A reasonable juror could determine that the short amount of time between the delivery of the pumps and the accident made it more likely than not that the pump left Graco's care and control without on-pump warnings.

Thus, our inquiry turns on whether Ritchie has presented a genuine issue of material fact as to whether the pump that she was using at the time of her accident was one of the pumps that Pieri delivered in January. The district court found that the accident pump was not one of pumps supplied by Pieri in January. This finding was primarily based on Pieri's testimony that the pumps that he delivered were cart-mounted pumps and the undisputed testimony of several employees, including Ritchie, that the accident pump was a drum-mounted pump. Unfortunately, the district court weighed the conflicting testimony and gave more weight to Pieri's statement than to the statements of other witnesses.

Pieri is the only witness who has stated that the pumps delivered in January were cart-mounted pumps, and he has not provided any additional evidence to support this contention. Neither Graco, Glidden, nor Pieri has produced any delivery records showing that the pump was cart-mounted./7 Ritchie disputes Pieri's testimony that the pumps that he delivered a month before her accident were cart-mounted pumps. In making this

claim, Ritchie does not simply rest on conclusory allegations, but instead sets forth specific evidence that brings Pieri's testimony into question. Pieri's testimony is directly contradicted by Richard Grooms who testified that the accident pump was one of the pumps brought in during the upgrade. Grooms testified that, "the only pumps that we had that were mounted like that with the drum application were the new Graco pumps that we brought in." (Grooms Dep. at 105). Defendants argue that Grooms' testimony is unreliable because elsewhere in his deposition he incorrectly stated the date of the pump upgrade. It is possible that a factfinder would indeed find Grooms' testimony unreliable, but this type of credibility assessment is not available at the summary judgment stage. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The testimony of Hodgie Thulin also casts doubt on Pieri's testimony. Pieri testified that the new pumps he delivered came in crates. But, according to Thulin, only drum-mounted pumps arrive in crates and cart-mounted pumps arrive "ready to go." Thulin Dep. at 94. We find that the conflicting testimony of Pieri, Grooms, and Thulin evidences a dispute as to whether the accident pump was one of the pumps delivered by Pieri in January. On a motion for summary judgment, we "may only determine whether or not there exists a dispute as to a material issue of fact. [We are] not permitted to resolve that dispute." Dreher v. Sielaff, 636 F.2d 1141, 1144 (7th Cir. 1980) (citing Carter v. Williams, 361 F.2d 189, 194 (7th Cir. 1966)). In much the same way that a court is not required to "scour the record in search of evidence to defeat a motion for summary judgment," Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996), nor is it permitted to "conduct a 'paper trial' on the merits of [the] claim." Reed v. McBride, 178 F.3d 849, 852 (7th Cir. 1999).

Although a non-moving party may successfully oppose summary judgment only

by presenting "definite, competent evidence to rebut the motion," Smith v. Severn 129 F.3d 419, 428 (7th Cir. 1997) (citations omitted), the party is not required to produce evidence which, if believed, would lead to a directed verdict in her favor. Ritchie's evidence that the accident pump lacked proper warnings when it left Graco's care and control is certainly not overwhelming. To prevail at trial, Ritchie will have to convince the factfinder that the offending pump was a Graco pump, that the pumps that Pieri delivered in January were drum-mounted as opposed to cart-mounted, and that they lacked warnings when they arrived at Redman. It is quite possible that she will not be able to do this. But to say that it is not certain that Ritchie will prevail at trial and that no rational factfinder could find in her favor are two different things. This case has an admittedly complicated record in which Pieri and the Redman employees frequently contradict themselves and each other. It is not our place to sort out which witnesses are telling the truth, which are mistaken, and which will be credible witnesses at trial. On a motion for summary judgment, "all doubts as to the existence of an a issue of material fact must be resolved against the movant." Dreher, 636 F.2d at 1143. When the evidence is viewed in the light most favorable to Ritchie, we find that she has demonstrated a genuine issue of material fact as to whether the accident pump left Graco's care and control in a defective condition.

2. Absence of Design Defect

Graco's second argument, which was not addressed by the district court, is that summary judgment is proper because Ritchie failed to allege that the pump had a design defect. This argument fails because Graco is incorrect in its assertion that a duty to warn can never arise in the absence of a design defect.

The duty to warn of a product's latent dangerous characteristics may arise even if there is no "defect" in the product. See Natural Gas Odorizing, Inc. v. Downs, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997). Plaintiff mischaracterizes Black v. Henry Pratt Co., 778 F.2d 1278, 1283 (7th Cir.

1985) and American Optical Co. v. Weidenhamer, 457 N.E. 2d 181, 187 (Ind. 1983) by citing them for the proposition that a design defect is a prerequisite to the duty to warn. The cases that plaintiff cites in support of this argument are better understood to hold that "[t]here is no duty to warn just because a product might conceivably cause injury." American Optical, 457 N.E.2d at 187 (quoting 63 Am. Jur. 2d 53, Product Liability sec. 42). Although a plaintiff must show that a defective product was unreasonably dangerous because of its inadequate warnings, see Moss v. Crosman, 136 F.3d 1169, 1174 (7th Cir. 1998), the Act does not require that the plaintiff show a design defect. By defining "defective condition" to include products that fail to display proper warnings, the Act makes it clear that a plaintiff does not have to allege a design defect to state a cognizable failure to warn claim. Section 33-1-1.5-2.5(b) states simply that "a product is defective under this chapter if the seller fails to: (1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product." Ind. Code Ann. (West 1996). Thus, "a product can be flawlessly designed, yet still be deemed defective by virtue of a manufacturer's failure to warn adequately of the dangers involved in the use of the product." Baker v. Monsanto, 962 F. Supp. 1143, 1147 (S. D. Ind. 1997) (citing Shanks v. A.F.E. Indus., 416 N.E.2d 833, 837 (Ind. 1981)); see also Jarrell v. Monsanto Co., 528 N.E.2d 1158, 1166 (Ind. Ct. App. 1988), trans. denied, 555 N.E.2d 453 (Ind. 1990).

3. Discharge of Duty to Warn


   Next, Graco contends that even if it had a duty to warn Ritchie of the dangers inherent in the use of high pressure pumps, it discharged this duty by providing Redman with instruction manuals that detailed the risks inherent in improper use of the spray pumps. Although the duty to warn end users of potential dangers is generally non-delegable, Indiana law does recognize an exception to this general rule. See Natural Gas Odorizing, 685 N.E.2d at 163. The "sophisticated intermediary" defense

provides that there is no duty to warn "when the product is sold to a 'knowledgeable or sophisticated intermediary' whom the manufacturer has adequately warned." Taylor v. Monsanto, 150 F.3d 806, 808 (7th Cir. 1998). In order to determine whether the sophisticated intermediary defense applies, several factors are to be weighed:

[T]he likelihood or unlikelihood that harm will occur if the intermediary does not pass on the warning to the ultimate user, the trivial nature of the probable harm, the probability or improbability that the particular intermediary will not pass on the warning and the ease or burden of the giving of the warning by the manufacturer to the ultimate user.

Natural Gas Odorizing, 685 N.E.2d at 163 (citing Dole Food v. N.C. Foam Indus. Inc., 935 P.2d 876, 880 (Ariz. Ct. App. 1996)).

In addition, the intermediary must have a level of sophistication and knowledge equal to that of the manufacturer, and the manufacturer must be able to reasonably rely on the intermediary to warn the ultimate user. See id. at 164. Graco argues that it has satisfied its duty to warn by providing on-pump warnings and instruction manuals with the equipment it supplied. However, whether a manufacturer has adequately discharged its duty to warn to qualify for the sophisticated intermediary defense is a question for the trier of fact. See Dole Food, 935 P.2d at 881. In the case at hand, there are genuine issues of fact concerning the presence of labels on the pumps that Graco supplied, and whether it was reasonable for Graco to rely on Redman to warn the ultimate users of danger. Thus, Graco may not prevail on summary judgment on this issue.

4. Proximate Cause

Finally, Graco argues that summary judgment is proper because the absence of on-pump warnings was not the proximate cause of Ritchie's injection injury. Proximate cause, however, is an issue for the factfinder, see MacDonald v. Maxwell, 655 N.E.2d 1249, 1251 (Ind. Ct. App.

1996), unless "only one conclusion can be drawn from the facts." City of Indianapolis Hous. Auth. v. Pippin, 726 N.E.2d 341, 347 (Ind. Ct. App. 2000). Graco claims that Brandenburger's action in turning on the pump while Ritchie was running her hands over the hose was an intervening cause of Ritchie's injury. While it is possible that a reasonable factfinder might find that Brandenburger's action was not foreseeable, and thus the absence of warnings was not the proximate cause of Ritchie's injury, this conclusion is not mandated by the facts of this case. Since more than one conclusion can be drawn, Graco may not prevail on summary judgment on the issue of proximate cause.

D.  Ritchie's Claims Against Glidden
1.  The Section 33-1-1.5-3 Claim

  Like her claim against Graco, Ritchie's first claim against Glidden is also based on the failure to warn under the Act. Ritchie, however, faces an additional obstacle in her suit against Glidden. The Act provides that "a product liability action . . . may not be commenced or maintained against any seller of a product . . . unless the seller is a manufacturer of the product or of the part of the product alleged to be defective." Ind. Code Ann. sec. 33-1-1.5-3(c) (West 1996). The Act defines "manufacturer" as a person or an entity who "designs, assembles, fabricates, produces, constructs, or otherwise prepares a product . . . before the sale of the product to a user or consumer," but sellers who possess "actual knowledge of a defect in a product" are also deemed to be manufacturers for the purposes of the Act. Ind. Code Ann. sec. 33-1-1.5-2(3) (West 1996).

  Glidden does not manufacture pumps within the meaning of the statute. Thus, absent evidence of actual knowledge, Glidden may not be deemed a "manufacturer" under the Act. Even assuming that Ritchie is correct that the accident pump was one of the pumps that Pieri delivered in January, Ritchie has not presented any evidence that Pieri had actual knowledge that the pumps lacked on pump warning labels. Ritchie claims that Pieri said that there were no labels on

the pumps that he delivered in January, but this is a mischaracterization of Pieri's deposition testimony. At one point in his deposition, Pieri specifically testified that he did not recall whether the pump had warnings or not. In an unrelated exchange, he also testified as follows:

Q:      Was there a warning with the pump?

A:      In the manual?

Q:      Yes.

A:      Yes.

Q:      Okay, was there a warning with the spray gun?

A:      Yes.

Q:      Do you recall what the warning on the pump said?

A:      It wasn't on the pump, it was in the manual.

Q:      In the manual with the pump?

A:      No.

(Pieri Dep. at 75)

This confusing exchange does not show that Pieri had actual knowledge of the lack of warnings on the pump, especially considering that Ritchie provides no other evidence to support her claim that Glidden had actual knowledge that it was supplying Redman pumps without warning labels. Accordingly, Ritchie has not put forth sufficient evidence to show that Glidden is a manufacturer as defined by the Act. Thus, she may not recover against Glidden for claims based on Section 33-1-1.5-3.

2. The Restatement (Second) of Torts Section 388 Claim

In addition to her claim against Glidden as a manufacturer under the Act, Ritchie also claims that she is entitled to recover from Glidden as the supplier of the accident pump. Ritchie bases her contention on the fact that the

Restatement (Second) of Torts imposes liability on a supplier of goods that are known to be dangerous for an intended use if the supplier does not use reasonable care to warn the consumer of the dangers of the chattel. See Restatement (Second) of Torts sec.sec. 388, 392 (1965). In McGlothlin v. M & U Trucking, Inc., 688 N.E.2d 1243 (Ind. 1997), the Indiana Supreme Court embraced section 388 of the Restatement (Second) of Torts as a proper vehicle for imposing liability on suppliers of dangerous chattels. Id. at 1245.

The Restatement provides that a supplier is "any person who for any purpose or in any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control." See Bogard v. Mac's Restaurant, Inc., 530 N.E.2d 776, 779 n.3 (Ind. Ct. App. 1988) (quoting Restatement (Second) of Torts sec. 388 cmt. c (1965)). A supplier is liable under section 388 if

the supplier (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Downs v. Panhandle E. Pipeline Co., 694 N.E.2d 1198, 1207-08 (Ind. Ct. App. 1998) (quoting Restatement (Second) of Torts sec. 388 (1965)). Similarly, section 392 imposes liability on "[o]ne who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes" if the supplier fails to "exercise reasonable care to make the chattel safe for the use for which it is supplied" or "exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it." Restatement (Second) of Torts sec. 392 (1965).

Glidden argues that it is not a supplier within the meaning of section 388 because Ritchie has not shown that it supplied

the pump in question.  The district court agreed and found that the accident pump was not one of the pumps delivered by Pieri in January because the undisputed testimony established that the accident pump was not a cart-mounted pump. However, Ritchie does not allege that the accident pump was a cart-mounted pump. Instead, she challenges Pieri's testimony that the pumps that he delivered in January were cart-mounted pumps. As discussed above, Ritchie has indeed shown that a genuine issue of fact exists regarding whether the pumps that Pieri delivered in January were cart-mounted pumps.

The district court also found that Ritchie had not put forth any other evidence showing that the pump was supplied by Glidden. Specifically, the district court noted that Ritchie had not produced the offending pump, and thus could not show its origin. We believe, however, that Ritchie can survive summary judgment without producing the offending pump. As Ritchie points out, the pump was never in her control or possession, and what Redman decided to do with the pump after the injury was not within her control.

As discussed in Part II.C.2, there is a genuine issue of fact as to whether the accident pump was one of the pumps delivered by Glidden in January. This, coupled with the fact that Ritchie has put forth sufficient evidence demonstrating Glidden's knowledge of the dangers inherent in the use of high pressure painting pumps is sufficient to defeat Glidden's motion for summary judgment.

III.  Conclusion

Because we find that issues of fact remain in Ritchie's claims against Graco and Glidden, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

/1 Defendants claim that Ritchie testified that she had been using the same pump

since September of 1995. Ritchie's actual deposition testimony is as follows:

Q:  From September of '95 up until the time of your accident, was the pump ever changed out that you recall?

A:  You mean taken away and brought back?

Q:  Yeah, or you know, something else put in?

A:  A different thing put in?

Q:  Right.

A:  No.

Q:  It was always the same pump?

A: Okay. I can't remember if it was ever taken out and brought back in. But I always used the same pump, whether it was the same pump or a different pump that looks the same, it was always the same type of pump.

(Ritchie Dep. at 28).

/2Redman employees referred to both cart-mounted and drum-mounted pumps as "Graco Bulldogs."

/3  Ritchie initially filed suit against Redman and Redman's parent company, Champion Enterprises, in addition to Graco and Glidden. On November 24, 1999, Ritchie agreed to voluntarily dismiss Champion from the suit. Redman moved for dismissal, and the district court granted the motion, finding that Ritchie's claims against Redman were barred by the exclusivity provision of the Indiana Workers' Compensation Act. Ritchie did not appeal the district court's finding.

/4 Although the Indiana Product Liability Act was repealed and recodified on July 1, 1998, the prior version cited above is controlling because the plaintiff was injured and filed suit prior to the effective date of the amendment. The recodification can now be found at Ind. Code sec.34-20-1 to 9. Relevant definitions of several terms used in the act are now found in Ind. Code sec.34-6.

/5 Section 33-1-1.5-3 of the Act entitled "Strict Liability Actions" provides that:

a person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer . . . is subject to liability for physical harm caused by that product to the user or consumer . . . if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:

(1) the seller is engaged in the business of selling such a product; and

(2) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this chapter.

Ind. Code Ann. sec. 33-1-1.5-3 (West 1996).

/6 Under Indiana law, "there is no doctrinal distinction between the negligent and strict liability failure-to-warn actions." Taylor v. Monsanto Co., 150 F.3d 806, 808 (7th Cir 1998). Therefore, Ritchie must show that the product was in a defective condition--that there was a duty to warn that was not fulfilled--in order to recover under the Act.

/7 Pieri recorded the model number of the pump he delivered in January as 224-619. Ritchie alleges that Pieri concedes that this model number does not match the number for a cart-mounted pump. Because Pieri's deposition testimony on this issue is somewhat confusing, we do not rely on it in making our finding.