In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 04-3837

GREGORY TOBER AND STACI TOBER,

*Plaintiffs-Appellants*,

*v.*

GRACO CHILDREN'S PRODUCTS,
INCORPORATED,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 02 C 1682—**Larry J. McKinney**, *Chief Judge.*

---

ARGUED SEPTEMBER 19, 2005—DECIDED DECEMBER 8, 2005

---

Before RIPPLE, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Gregory and Staci Tober filed this action pursuant to Indiana's Product Liability Act ("IPLA"), seeking recovery for the heartbreaking death of their eight-month-old son, Trevor Tober. Following a week-long trial, a jury rendered a verdict in favor of Graco Children's Products, Incorporated ("Graco"), finding that the Tobers had failed to prove by a preponderance of the evidence that one of Graco's products, the Lil' Napper Plus Battery Powered Swing ("Lil' Napper") model no. 12-476 manufactured in 1995 by Century Products Com-

pany ("Century"),[1] was defective. On appeal, the Tobers contend that the district court erred in the exclusion of certain evidence at trial, in certain rulings the district court made as a matter of law prior to trial, and in how the district court instructed the jury. Notwithstanding the tragic death from which this case arises, we agree with the district court's rulings and, therefore, affirm.

## I. BACKGROUND

On the morning of April 2, 2002, Staci Tober dropped off her eight-month-old son, Trevor, at Timolyn Fitzgerald's suburban Indianapolis home. Ms. Fitzgerald owned and operated an unlicensed, in-home daycare named Precious Angels Daycare ("Daycare"). On that day, Ms. Fitzgerald and her mother were caring for ten other children.

Among the variety of children's products in Ms. Fitzgerald's home was a Lil' Napper. The Lil' Napper swing consisted generally of an A-frame structure with a seat suspended from two bars. A battery-powered motor sat atop the A-frame and moved the bars suspending the seat forward and backward in a swinging motion.

The Lil' Napper swing came with a harness restraint system which was comprised of an inch-wide strap that extended from the rear of the swing through two slots or channels near the top of the back of the seat. The two straps fit over each of the child's shoulders to meet in a "V" between the child's legs. At the end of the "V" was a buckle that secured the over-the-shoulder straps to the bottom of the swing's seat between the child's legs. The harness restraint system was also equipped with a "strap slide" which was positioned on the back side of the swing's seat to

---

[1] Through an asset purchase, Graco assumed liability for Century's products, including the baby swing at issue in this case.

anchor the over-the-shoulder straps firmly to the back of the seat. The strap slide allowed a caretaker to adjust the harness straps to fit infants of various sizes. The last component of this restraint system was a "harness tie." The harness tie was threaded through the two over-the-shoulder harness straps and positioned on top of the infant's chest.

Century included an instruction manual with the Lil' Napper swing that specifically addressed the proper use of the harness restraint system. Century also placed warning labels on all Lil' Napper swings, including Ms. Fitzgerald's, that stated, among other things, the following:

> NEVER LEAVE CHILD UNATTENDED
>
> ALWAYS KEEP CHILD IN VIEW EVEN WHILE SLEEPING
>
> STAY WITHIN REACH OF YOUR CHILD.

The instruction manual stated that failure to use the restraint system properly may result in the baby falling from the swing. There was no mention of any potential risk of entanglement or strangulation. Ms. Fitzgerald testified at trial that she bought the Lil' Napper swing new in 1995 and that it was fully and properly assembled at the time of purchase, except for portions of the legs which she installed herself. Ms. Fitzgerald testified that she did not read the instruction manual or the warning labels affixed to the infant swing because she felt she could operate the swing without reading any of the materials that came with the swing.

By 1997, Century had received four reports of children who were either injured or killed after becoming entangled in the Lil' Napper's harness straps. Century investigated each of these accidents and discovered that each had occurred because the Lil' Napper had not been used according to the instructions. Specifically, the caregivers in each

situation had applied the harness straps too loosely while leaving the infant unattended in the swing. Based on this potential hazard from misuse, Century voluntarily recalled the Lil' Napper swing in 1997. Century notified owners of the Lil' Napper that it would retrofit the swings with new seat pads and provide a combination waist/crotch harness to substitute for the V-shaped harness. The U.S. Consumer Product Safety Commission ("CPSC" or "commission") approved Century's voluntary recall program.

On the morning of April 2, Ms. Fitzgerald fed Trevor breakfast and put him in the Lil' Napper swing where he usually took a morning nap. While Trevor was in the swing, Ms. Fitzgerald turned her attention to the other children at the daycare. Ms. Fitzgerald kept Trevor in her sight while she fixed breakfast for the other children, but left Trevor alone while she went downstairs with her mother to deliver breakfast to the children.[2] When Ms. Fitzgerald returned upstairs, she found Trevor hanging from the swing with the harness straps wrapped around his neck. Fitzgerald untangled Trevor, called 911, and started CPR. Emergency personnel arrived and took Trevor to the hospital where he later died from asphyxia.

On the day of the accident, police crime lab experts inspected the daycare and the condition of the Lil' Napper swing. The officer in charge of the investigation testified that the harness straps of the swing had been tied together in a fixed knot behind the back of the seat which made the harness straps of the swing impossible to tighten and properly fit Trevor. The officer also testified that the

---

[2] It is disputed how long Fitzgerald was downstairs with Trevor out of her sight. Fitzgerald told the police who investigated the accident that she was downstairs for 30 minutes. In her deposition and testimony at trial she stated that she only left Trevor unattended for a maximum of seven minutes.

harness restraint of the Lil' Napper had been re-routed through the wrong slot in the back of the seat.

After Trevor's death, the Tobers filed a civil suit in state court against Ms. Fitzgerald, Daycare, and Graco. The Tobers eventually settled with Ms. Fitzgerald and her Daycare, and Graco removed the case to federal court. In their complaint, the Tobers alleged that Graco negligently designed the swing, failed to include appropriate warnings with the swing, and failed to correct the defect, warn of the danger and adequately recall the swing. A jury thought otherwise and returned a verdict in favor of Graco. This appeal followed.

## II. ANALYSIS

A.   Evidentiary Ruling

At trial, the Tobers sought to introduce a four-page letter dated October 23, 1997, from the CPSC to Century. In the letter, CPSC informed Century of its preliminary determination that the Lil' Napper infant swings:

> [P]resent a substantial risk of injury to children . . . Specifically, if the harness-style restraint straps are loose or unbuckled, a child in the swing seat may become entangled in the straps and strangle. The staff welcomes and will give full consideration to any comments or additional information from the firm concerning its preliminary determination. . . .

The district court excluded the letter from trial. On appeal, the Tobers argue that the letter should have been admitted under Fed. R. Evid. 801(d)(2)(B) as an adoptive

admission by a party-opponent.[3]

We review a district court's evidentiary decisions for abuse of discretion and afford great deference to a district court's determinations in this area. *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005). With respect to statements contained in a letter, the failure to reply to a letter may be introduced as an admission of the statements contained in the letter when the receiver of the letter remains silent in a situation where a response would seem natural or expected. John W. Strong, McCormick on Evidence § 262 at 171 (5th ed. 1999). The burden is on the party seeking to introduce the letter to establish that under the circumstances the failure to respond is so unnatural that it supports the inference that the party acquiesced to the statements contained in the letter. *Ricciardi v. Children's Hosp. Med. Ctr.*, 811 F.2d 18, 24 (1st Cir. 1987).

We find that the district court did not abuse its discretion when it excluded the letter. First, CPSC's letter does not indicate that the commission conclusively determined that the Lil' Napper was defective. To the contrary, CPSC made only a "preliminary determination" that the swing presented a substantial risk of injury if not used properly. Second, the letter does not mandate any corrective action beyond that already voluntarily underway. The commission "acknowledge[d] and encourage[d] the actions which Century Products ha[d] already taken to correct the problem" and "accepted Century's plan as adequate." Finally, the Tobers' argument that the failure to respond constitutes an adoptive admission is further undermined by

---

[3] Fed. R. Evid. 801(d)(2)(B), in relevant part, states as follows: "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth."

the letter itself, which states that: "A firm's taking corrective action does not constitute admission by the firm that a substantial product hazard exists." The district court did not abuse its discretion when it found that, particularly in light of these representations in the letter, failure to respond was not so unnatural as to support an inference of acquiescence to the commission's preliminary findings.

The Tobers also make two bootstrapping arguments for introducing the letter, which we will address briefly. First, the Tobers argue that Century's subsequent nonverbal conduct—recalling the Lil' Napper swing—amounted to an adoptive admission that the swing was defective.[4] As we have just noted, this argument is squarely contradicted in the letter where the commission states that corrective action is not necessarily an admission that a product is defective. Even assuming, *arguendo*, that the recall amounted to an admission, such corrective action is still not an evidentiary basis for admitting the letter.

The Tobers also point to Century's Quality Assurance Manager David Galambos's testimony that there was a "joint decision" to recall the Lil' Napper to support their argument that Graco, then Century, adopted the CPSC's determination. Here again, the Tobers erroneously attempt to bootstrap the admissibility of the CPSC's October 23 letter to the undisputed admissibility of Century's Quality Assurance Manager's testimony that there was a joint decision to recall the swing.[5] As we have just stated, Cen-

---

[4] Evidence that Century voluntarily recalled the Lil' Napper in 1997 was admitted at trial and is not now challenged on appeal.

[5] Century's Quality Assurance Manager David Galambos testified at trial and during his deposition that the Lil' Napper's design was defective and there was a joint decision to recall the product. The parties do not dispute the admissibility of Galambos's

(continued...)

tury's decision to recall the Lil' Napper, whether made singularly or in conjunction with CPSC, does not necessarily constitute an admission that the product was defective.

Even if we believed it was error for the district court to exclude the letter, the error was harmless because the letter would have been cumulative of other evidence presented at trial. The district court admitted the Tobers' evidence, such as testimony from corporate representatives, that Century knew that the Lil' Napper presented a strangulation risk, that Century recalled the Lil' Napper because of that risk, and that Century improved the harness restraints as a result of the risk. As a result, the Tobers were not prejudiced by the district court's exclusion of CPSC's October 23 letter to Century.

### B. The District Court's Grant of Judgment as a Matter of Law

In their complaint, the Tobers alleged that Graco negligently failed to (1) correct the defect in the Lil' Napper swing, (2) warn of the danger presented by the swing, and (3) recall the swing adequately. In its motion for summary judgment, Graco argued that Indiana courts do not recognize a claim for negligent recall. The district court agreed and granted summary judgment in favor of Graco. At the pre-trial conference, the court questioned the Tobers on the substance of their duty-to-warn claim. Counsel for the Tobers explained that they intended to introduce evidence that the recall process was delayed, inadequate, and flawed. The court concluded that the plaintiffs'

---

(...continued)
testimony.

duty-to-warn claim was simply a re-named negligent recall claim and granted judgment as a matter of law on this claim.

On appeal, the Tobers contend that Graco was unreasonably dilatory in discharging its post-sale[6] duty to warn of the strangulation hazard posed by the Lil' Napper and when Graco finally did issue a post-sale warning, via a recall, the warning was flawed.[7] The Tobers argue that the district court erred in granting summary judgment in favor of Graco because both the Indiana Supreme Court in *Dague v. Piper Aircraft Corp.*, 418 N.E.2d 207 (Ind. 1981), and the district court in *Reed v. Ford Motor Co.*, 679 F. Supp. 873 (S.D. Ind. 1988) (interpreting Indiana law), established a post-sale duty to warn under Indiana law.[8] We find that the Tobers' argument overstates the holdings in *Dague* and *Reed,* and that the district court properly granted summary judgment on the Tobers' post-sale failure-to-warn claim.

In *Dague*, this court certified to the Indiana Supreme Court the following question: Does the IPLA's statute of limitation apply to bar plaintiff's failure-to-warn claim? 418

---

[6] "Post-sale" warnings refer to warnings required where a manufacturer does not know or have reason to know of a hazard at the time a product is sold, but discovers the hazard sometime later. *Liriano v. Hobart Corp.*, 700 N.E.2d 303, 307 (N.Y. 1998). Warnings that were or should have been given when a product was sold are referred to as "point of sale" warnings. *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 861 P.2d 1299, 1313 (Kan. 1993).

[7] It is unclear from the record whether this post-sale, duty-to-warn claim was ever presented to the district court or to the jury.

[8] It is undisputed that the IPLA, Ind. Code §§ 34-20-1-1 to -9-1 (2002) does not expressly prescribe or define a cause of action arising from a manufacturer's post-sale duty to warn.

N.E.2d at 209. The Indiana Supreme Court concluded that the state legislature did not intend to exclude such a claim from the IPLA because there is no express language in the IPLA excluding a duty-to-warn claim. *Id*. at 212. The court then reasoned that, to the extent a failure-to-warn claim is based on a theory of negligence seeking damages for an alleged product defect, such a claim would be governed by the IPLA and its statute of limitations because the IPLA expressly states that it is to govern *all* product-liability actions, regardless of whether the theory of liability is negligence or strict liability in tort. *Id*. The Indiana Supreme Court, however, stopped short of recognizing a cause of action for post-sale failure to warn. The court never identified any particular section of the IPLA defining a post-sale duty to warn, nor did the court articulate the contours of such a cause of action under Indiana common law.

Similarly, in *Reed*, the plaintiff sought recovery against the defendant under theories of strict liability and negligence. 679 F. Supp. at 878. As an element of both claims, Reed alleged that Ford improperly failed to warn him of the inherent dangers associated with the transmission system installed in his truck. *Id*. In its motion for summary judgment, Ford argued that, under Indiana law, its duty to warn of any product defects existed only at the time of the sale to the original customer. In analyzing §§ 33-1-1.5-2.5(a) & (b) of the Indiana Code, which preceded §§ 34-20-41-1 and 34-20-4-2 of the IPLA, the court held that there was insufficient evidence to grant judgment as a matter of law because the IPLA did not expressly exclude liability under a theory of post-sale duty to warn. Similar to the court in *Dague*, the district court in *Reed* also stopped short of recognizing that such a claim exists under the IPLA. 679 F. Supp. at 879.

In our review of the IPLA as well as state and federal case law, we too find that, although the Indiana legisla-

ture did not expressly exclude a manufacturer's post-sale duty to warn from the IPLA, the statute does not expressly prescribe or define any cause of action arising from a post-sale duty to warn. Therefore, the Tobers' claim that Graco breached its post-sale duty to warn fails, and the district court properly granted judgment as a matter of law.

## C. Jury Instruction

The Tobers argue that the district court erred when it instructed the jury that, to prevail on their product liability claim, they were required to prove that the Lil' Napper was not substantially altered when Trevor used the swing. The Tobers contend that the IPLA should be interpreted to require them only to prove that the swing, *when purchased*, had not been substantially altered. The Tobers argue that, otherwise, the jury instruction shifted the burden of a manufacturer's "affirmative defense," substantial alteration, onto the plaintiffs.[9] We disagree.

We review a district court's instruction to the jury for an abuse of discretion, unless the instruction was based on

---

[9] The IPLA § 34-20-6-5 defines substantial alteration as a defense available to a manufacturer, not as an affirmative defense as the Tobers contend. An affirmative defense limits or excuses a defendant's liability even if the plaintiff establishes a *prima facie* case. In contrast, § 34-20-6-5 defines how a manufacturer can directly controvert a plaintiff's *prima facie* case.

The IPLA recognizes as a defense to the Tobers' *prima facie* case that the proximate cause of Trevor's death was a modification or alteration of the Lil' Napper made after the product's delivery to the initial user or consumer. *See* Ind. Code § 34-20-6-5. In other words, a manufacturer can controvert a plaintiff's *prima facie* case by arguing that an alteration or modification to the product that was not present when the product left the manufacturer's control proximately caused the plaintiff's physical harm.

an error of law in which case our review is *de novo. United States v. Smith*, 415 F.3d 682, 688 (7th Cir. 2005). Under the IPLA, to prevail at trial, the Tobers must prove that: (1) the product was defective and, as a result, unreasonably dangerous; (2) the defect existed when the product left the defendant's control; (3) the product was expected to and did reach the consumer without substantial alteration; and (4) Trevor's injuries were proximately caused by the defect in the product. *Ritchie v. Glidden Co.*, 242 F.3d 713, 720 (7th Cir. 2001) (interpreting the IPLA). Consistent with the IPLA, the district court instructed the jury as follows:

> To prevail on their product liability claim, the Tobers must prove each of the following elements by a preponderance of the evidence:
>
> 1.  that Graco was a manufacturer of the part of the product alleged to be defective and was in the business of selling the Lil' Napper;
>
> 2.  that Graco sold, leased or otherwise put the Lil' Napper into the stream of commerce;
>
> 3.  that at the time the Lil' Napper left the hands of Graco, it was in a defective condition unreasonably dangerous to any user or consumer;
>
> 4.  that the Lil' Napper was expected to reach and did reach Trevor Tober without substantial alteration of the condition in which the product was sold by Graco;
>
> 5.  that Trevor Tober was in a class of persons that Graco should have reasonably foreseen as being subject to the harm caused by the defective condition;
>
> 6.  that Trevor Tober was harmed; and
>
> 7.  that the defective condition of the Lil' Napper was a proximate cause of the harm to Trevor Tober.

Both the IPLA and the district court's instruction require the Tobers to prove that the product was defective when it left the manufacturer and remained in the same defective condition when the end-user, Trevor in this case, used the product in a manner the manufacturer intended. *See* Ind. Code § 34-20-2-1. A manufacturer, therefore, is liable only for its own defects in the products, and not for defects caused by the alteration or misuse of its products.[10] Accordingly, the district court's jury instruction was not an abuse of its discretion because neither the IPLA nor the court's instruction shifted an undue burden onto the Tobers.

More significantly, even if the jury instruction regarding product alteration incorrectly represents Indiana law, any error is harmless. The verdict form indicates that the jury decided, pursuant to question #3, that the Tobers had not proven by a "preponderance of evidence that at the time the Lil' Napper left the hands of Graco . . . it was in a defective condition unreasonably dangerous to any user or consumer." The jury, therefore, never reached the question of the presence or absence of alteration, which was addressed in question #4 on the verdict form. *See O.K. Sand & Gravel, Inc. v. Marietta Tech., Inc.*, 36 F.3d 565, 569 (7th Cir. 1994) (holding that when a verdict form indicates that the jury never reached the instruction in question, error is typically harmless).

---

[10] The Tobers' argument, on the other hand, would result in limitless manufacturer liability. For example, under the Tobers' theory, a car manufacturer would be liable for "defective brakes" even when an end-user of the car intentionally disabled the brake system and then was unable to stop the car, causing harm to himself or others.

## III.  CONCLUSION

For the foregoing reasons, the rulings of the district court are AFFIRMED.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*