# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3300

ANDREW BOURNE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MARTY GILMAN, INCORPORATED,
doing business as Gilman Gear,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 03 C 1375—**David F. Hamilton**, *Judge.*

ARGUED MAY 9, 2006—DECIDED JUNE 20, 2006

Before CUDAHY, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* When Ball State student Andrew Bourne rushed onto a football field with a crowd that tore down a goalpost, the post fell on his back and rendered him paraplegic. He and his parents sued Gilman Gear, manufacturer of the post, in diversity under Indiana law arguing that the post was defective and unreasonably dangerous because (1) it was foreseeable that fans will tear down goalposts, (2) the average fan would not understand the extent of the risk, and (3) there are alternative designs that would reduce that risk. The district court granted summary judgment for Gilman Gear because the risk was obvious. We affirm.

## I. HISTORY

We have taken the facts of this sad but straightforward case from the parties' summary judgment papers, beginning with Bourne's testimony that, in October 2001 when he was 21-years old, he attended his first-ever tailgating party outside the game. Near the end of the fourth quarter, he joined a crowd to storm the field in celebration of an imminent Ball State victory. Bourne himself did not rip down the post. He jumped and tried to grab it, missed, and walked away. With his back to the post, he heard a snap, and the post fell on his back, causing his injuries. Although he knew that the post would collapse, he expected it to do so gradually.

As both parties agree, Ball State itself encouraged the crowd to pull down goalposts with a flashing sign on the scoreboard that read, "The goalpost looks lonely." Indeed, the school had earlier resolved that controlling the crowd might prove even more dangerous than letting it tear down the goalposts. (Ball State is not a party now because it settled for a paltry $300,000, a limit imposed by state tort reform in the 1970s.)

Neil Gilman, the president of Gilman Gear, testified that his company has known all along that fans sometimes tear down posts; he also described his company's posts. The posts, he explained, are about 40-feet tall and weigh 470 pounds. They are aluminum rather than steel because steel is heavier, harder to install, and tends to rust. And they are the so-called "slingshot" style with one vertical support holding up the structure. This slingshot style was introduced in 1969 so as to minimize the danger posed to players in the end zone by the old H-shaped goalposts with two vertical supports. Notably, Gilman Gear did not design the posts itself; instead, it bought the design in 1985. To facilitate "rolling" of the metal in its newly assumed manufacturing process, Gilman Gear switched to a differ-

ent, less-brittle type of aluminum alloy than was used by the prior maker. When asked if his company had "considered engineering controls" to address hazards created by pulling down posts, Gilman said no.

To avert summary judgment, the Bournes submitted the affidavit of their expert, Vaughn Adams, a Ph.D. in Safety Engineering, who testified that reasonable manufacturers should foresee that goalposts will be torn down by fans. Adams compiled non-exhaustive numbers of football games in which students tore down posts: 16 in 2000, 10 in 2001, 17 in 2002, 12 in 2003, and 3 by October 2004. Adams also noted Gilman's testimony that he knew about some or all of those tear-downs (though not all were Gilman Gear posts). Additionally, Adams cited two newspaper articles reporting incidents of injury other than Bourne's, though he did not attempt to compile statistics.

In short, Adams's—and the Bournes'—theory is that, when fans try to pull them down, Gilman Gear's aluminum posts will at first bend but then suddenly "snap," abruptly falling on unwary fans whose lay knowledge of metallurgy lulls them into believing that goalposts fall gradually enough to permit a safe retreat. Adams, however, did not testify to any science on which he based his opinion. For example, he offered only speculation to support his premise that social and cultural pressure misleads the average fan into believing that goalposts collapse slowly enough that ripping them down is safe. Moreover, although he hinted that Gilman Gear's change in aluminum alloy in 1985 rendered the posts more dangerous, he cited no evidence comparing the posts before and after the change. Instead, his conclusions apparently rested on availability of alternative designs. The first of these alternative designs is the "double-offset gooseneck," which reinforces the single vertical support with another support right next to it. Second is a "hinged" goalpost, first introduced by the University of Iowa in the 1990s, which permits the

athletic facility to lower the posts immediately after a game. (Gilman Gear itself began making and selling these posts after Bourne's injury; at least one other company makes them, too.) Third, there is the "fan-resistant" or "indestructible" goalpost made by Merchants Environmental Industries, Inc. This third kind is made out of steel, less likely to break than aluminum. But just as Adams did not conduct tests on any posts manufactured by Gilman Gear, he did not test any other company's posts or cite to any scientific data. Instead, he presented just a few marketing materials distributed by makers of these alternative designs. While posts like the one that injured Bourne cost $4,700 per pair, the hinged posts cost $6,500 and the "indestructible" posts between $23,000 and $32,000. The cost of the double-gooseneck rigs is not in the record. Adams assumed that a cost-benefit analysis shows the pricier alternatives to be preferable in light of their greater safety and lower rate of replacement. He also opined that Gilman Gear was negligent for failing to test its posts to determine when they would break.

In granting summary judgment for Gilman Gear, the district court held that Indiana law barred recovery for the Bournes because it was obvious to a reasonable person that a collapsing goalpost poses a risk of serious injury. The court reasoned that Andrew Bourne's subjective failure to appreciate the magnitude of the risk that a collapsing post might strike his back and take away the use of his legs did not alter the fact that the risk of injury was obvious as a matter of law and, consequently, that the post was not unreasonably dangerous. In so holding the district court acknowledged that in Indiana the so-called "open and obvious" rule is no longer an absolute bar to a claim under the Products Liability Act against a manufacturer, but the court reasoned that the principle remains relevant and, in this case, was decisive.

## II. ANALYSIS

On appeal the Bournes maintain that the "open and obvious" rule cannot bar a claim for defective design under the Indiana Products Liability Act. Relying on *Mesman v. Crane Pro Servs.*, 409 F.3d 846, 849-52 (7th Cir. 2005), they insist that they can win despite the obviousness of the risk if they can nonetheless prove through the application of the classic formulation of negligence that Gilman Gear should have adopted a reasonable alternative design.

The relevant law is codified in the Indiana Products Liability Act. Ind. Code §§ 34-20-1-1 to 34-20-9-1. Although the Act originally applied only to strict liability (for manufacturing defects and failure to warn), it was amended in 1995 to apply to claims of defective design, which traditionally sound in negligence. *Mesman*, 409 F.3d at 851. *Compare* Ind. Code § 33-1-1.5-1 (1995) *with id.* (1990). The law was re-codified in 1998, but without relevant change. *Compare* Ind. Code §§ 34-20-1-1 to 34-20-9-1 (effective July 1, 1998) *with* Ind. Code §§ 33-1-1.5-1 to 33-1-1.5-10 (1997).

A plaintiff bringing an action under the Act must establish that (1) he or she was harmed by a product; (2) the product was sold "in a defective condition unreasonably dangerous to any user or consumer"; (3) the plaintiff was a foreseeable user or consumer; (4) the defendant was in the business of selling the product; and (5) the product reached the consumer or user in the condition it was sold. *See* Ind. Code § 34-20-2-1; *see also Moss v. Crosman Corp.*, 136 F.3d 1169, 1171 (7th Cir. 1998).

At the outset, we note that Indiana is a comparative-fault state and contributory negligence is not a complete bar unless the plaintiff bears more than 50% of the blame for his own injury. Ind. Code. §§ 34-20-8-1; 34-51-2-7, -8; *see also Smith v. Baxter*, 796 N.E.2d 242, 244-45 (Ind. 2003). What is more, misuse is not a bar unless the misuse was

"not reasonably expected by the seller." Ind. Code § 34-20-6-4; *see also Morgen v. Ford Motor Co.*, 797 N.E.2d 1146, 1149-50 (Ind. 2003). Likewise, the statute protects "any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use." Ind. Code § 34-6-2-29; *see also Stegemoller v. ACandS, Inc.*, 767 N.E.2d 974, 975 (Ind. 2002). Mindful of these rules and Neil Gilman's testimony that his company actually foresaw the fans' vandalism, Gilman Gear does not argue that the claim should be barred on the basis of misuse or Bourne's fault. Consequently, we need not pass on whether this is a case in which no reasonable jury could find that the plaintiff was less responsible for his own injury than others were, *see, e.g.*, *Barnard v. Saturn Corp., a Div. of Gen. Motors Corp.*, 790 N.E.2d 1023, 1031 (Ind. Ct. App. 2003).

The only question presented by the parties is whether the goalpost was "in a defective condition unreasonably dangerous to any user or consumer." Actually, this is two questions because Indiana law requires the plaintiff to show that a product is both "in a defective condition" and that it is "unreasonably dangerous." *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657 (7th Cir. 1998) (citing *Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 440-41 (Ind. 1990)); *Moss*, 136 F.3d at 1171, 1174; *see also Baker v. Heye-America*, 799 N.E.2d 1135, 1140 (Ind. Ct. App. 2003) (applying the statute after the 1998 recodification).

The district court started and finished its inquiry with the first prong, whether the post was "unreasonably dangerous." "Unreasonably dangerous" means "any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." *Id.* § 34-6-2-146. Applying that rule in this case, the district court

decided that any reasonable person on the field should have known the general danger posed by a falling goalpost. Consequently, the court concluded, recovery was barred under precedent holding that a user's knowledge of a general risk precludes recovery even if he did not know the extent or specific degree of that risk.[1] For example, a family whose child was killed by a BB gun could not prevail on the theory that, although they knew when they bought the gun that it could seriously injure him, they did not know it could kill. *Moss*, 136 F.3d at 1173-76. Nor could an electrician's estate succeed on a claim against the manufacturer of a metal crane on the theory that he knew he could be shocked if it touched power wires, but not that he could be killed. *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 625-26 (7th Cir. 1995). Whether or not Andrew knew the post could suddenly "snap" and paralyze him, he should have known that it could fall and seriously injure him, and the district court considered that the end of the matter.

The Bournes' principal objection to this ruling is that the district court explained that their recovery was barred because the danger was "obvious" as a matter of law. They rely on our recent opinion in *Mesman* explaining that, after the Indiana legislature in 1995 expanded its code of products liability to cover all theories of liability including defective design, Indiana law no longer permits a manufacturer to avoid liability in a design defect case simply because a defect is "open and obvious." *See Mesman*, 409 F.3d at 850-51. *Compare* Ind. Code § 33-1-1.5-1 (1995) *with id.* (1990). After all, a product may be designed with a

---

[1] There are very few cases about goalposts being torn down, *e.g.*, *Cimino v. Yale Univ.*, 638 F. Supp. 952 (D. Conn. 1986); *Univ. of Tex. at El Paso v. Moreno*, 172 S.W.3d 281 (Tex. App. 2005); *Pallazola v. Town of Foxborough*, 640 N.E.2d 460 (Mass. 1994), and none is informative here.

feature that, although obvious, is nonetheless unreasonably prone to cause accidents. For example, a machine may have an exposed moving blade or other part such that the user, though he knows of it, may nonetheless slip and fall and cut off his hand. *Id.* at 851. Since that injury is easily foreseeable and cheaply preventable by attaching a guard, the manufacturer ought not get off the hook. *Id.* Indeed, that interpretation makes sense; the accident magnet is just as obvious to the designer as the user, and the rule should not work just one way.

Rather than the open-and-obvious defense, the statute creates the so-called "incurred risk defense," which requires the defendant to establish that the user actually knew of the product's danger. Ind. Code § 34-20-6-3; *Mesman*, 409 F.3d at 850. But like the defendant in *Mesman*, Gilman Gear did not plead this defense and does not argue its application now.

Despite the use of some imprecise language here (the court should have said that the goalpost was not unreasonably dangerous as a matter of law, rather than declaring that the danger posed by the goalpost was obvious as a matter of law), the gist of the district court's ruling is sound. Indeed, the district court, like the *Mesman* court and the Indiana Supreme Court, expressly recognized that the "open and obvious" rule has been abrogated. The district court was correct, furthermore, that obviousness remains a relevant inquiry because, as noted above, the question of what is unreasonably dangerous depends upon the reasonable expectations of consumers and expected uses. *See* Ind. Code §§ 34-20-4-1, 34-6-2-146; *Mesman*, 409 F.3d at 850-51; *FMC Corp. v. Brown*, 551 N.E.2d 444, 446 (Ind. 1990). In some cases, the obviousness of the risk will obviate the need for any further protective measures, or obviousness may prove that an injured user knew about a risk but nonetheless chose to incur it. *Mesman*, 409 F.3d at 850-51; *FMC Corp.*, 551 N.E.2d at 446. Although obviousness typically

factors in the equation for the jury (it is evidence but "not conclusive evidence," *Mesman*, 409 F.3d at 851), there are some cases where the case is so one-sided that there is no possibility of the plaintiff's recovery. *See Moss*, 136 F.3d at 1173-76. And the bottom line is that Indiana law does not permit someone to engage in an inherently dangerous activity and then blame the manufacturer. *See id.*

Undeterred, the Bournes nevertheless maintain that, because the goalpost can be made safe (unlike a BB gun), a window remains open for them to show defective design because the goalpost exposed Andrew to a greater risk than he should have expected. In other words, the product exposed him "to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." Ind. Code § 34-6-2-146. Even indulging that argument, *cf. McMahon*, 150 F.3d at 657, the Bournes must lose because they cannot show a defect with the evidence that they have adduced.

A defective product is one sold in a condition "(1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption." Ind. Code § 34-20-4-1. That definition is decidedly unhelpful. But fortunately the statute more clearly explains that a plaintiff alleging a design defect cannot prevail without showing that the manufacturer was negligent. *See id.* § 34-20-2-2; *Mesman*, 409 F.3d at 849 (citing cases). That requires applying the classic formulation of negligence: B<PL. *Mesman*, 409 F.3d at 849 (citing *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947)). A caveat (hinted at above) is that there is no duty for a manufacturer to redesign a product that cannot be made safe, like a BB gun. *See* Ind. Code § 34-

20-4-4 ("A product is not defective under this article if the product is incapable of being made safe for its reasonably expectable use, when manufactured, sold, handled, and packaged properly."); *cf. Moss*, 136 F.3d at 1173.

The Bournes are not the first to make this type of argument. In *McMahon*, a woman injured by hot coffee that spilled into her lap sued the manufacturer of the coffeepot on the theory that its design was defective insofar as it made the coffee hotter than necessary, and hotter than she, as a reasonable consumer, expected. *McMahon*, 150 F.3d at 657-59. A better design, she argued, would produce a slightly cooler cup of coffee. *Id.* at 657-58. To this end, she submitted the testimony of an expert who opined that the coffeepot could easily, and cost effectively, be made to produce a cooler, yet tasty, cup of coffee. *Id.* But just because the safer pot could be made did not mean that the manufacturer's pot was defective. *Id.* at 657-59. Instead, it was her burden to show that the cost-benefit formula demanded adopting the alternative design. *Id.* Yet her expert did not explain the basis for his conclusion regarding the risks, benefits, and costs of reducing the temperature of the coffee. *Id.* at 658. Nor was the case one in which there was no possible benefit from hotter coffee such that *res ipsa loquitur* might apply. *Id.* at 658-59. For that reason, and because an expert's conclusory assertions are of no evidentiary value, summary judgment was affirmed. *Id.* at 657-59.

The Bournes' case shares the same fatal flaw. Their expert's affidavit is their only evidence that the design is defective. But just like the expert in *McMahon*, Adams's testimony is comprised of mere conclusions. For the premise that fans are unaware of the risks, he offers only speculation that social pressure and publicity falsely assure them that pulling down posts is safe. (Perhaps seeing the weakness, the Bournes contend simply that people would not rip down posts if they knew the risks.) As mentioned above, Adams's suggestion that Gilman Gear's change in alumi-

num alloy in 1985 made the product less safe is nothing but innuendo. Moreover, Adams does not provide a basis on which a finder of fact could evaluate the frequency of injuries caused by goalposts, or calculate the extent to which risk would actually be reduced by the alternative designs, or justify the cost of those alternatives relative to the benefits of aluminum posts. Although Gilman Gear points out such flaws, explaining that Adams's affidavit actually proves the infrequency of injury relative to the number of games, the Bournes retort simply that Adams's testimony was not meant to provide those statistics. As if unaware of their burden, they say neither statistics nor testing is required because the competitors actually sell safer (according to Adams) posts (although they are 38% to 700% more expensive). But that will not do: mere existence of a safer product is not sufficient to establish liability. *See McMahon*, 150 F.3d at 657-59; *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1206 (7th Cir. 1995); *Pries v. Honda Motor Co., Ltd.*, 31 F.3d 543, 545 (7th Cir. 1994). Otherwise, the bare fact of a Volvo would render every KIA defective.

Finally, Adams does not even consider the possibility of unintended increases in risk to intended users, like the students or staff who would have to hurriedly lower the hinged post to police the crowd at the end of a game. But the costs of those incidental effects must be weighed in the balance. *See Pries*, 31 F.3d at 545 (criticizing an expert's testimony for failing to consider whether a proposed alternative design to protect the victim of a particular auto accident might not increase risks to other users). After all, Indiana neither requires manufacturers to be insurers nor to guard against all risks by altering the qualities sought by intended users. *See McMahon*, 150 F.3d at 659.

### III.  CONCLUSION

Because the district court's conclusion that Indiana law does not require manufacturers to protect consumers and

users from themselves is fundamentally correct, and because any jury's application of the B<PL formula based on this record would be mere speculation, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*