In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3390

GREGORY AREGOOD, JR., *et al.*,

*Plaintiffs-Appellants,*

*v.*

GIVAUDAN FLAVORS CORPORATION,
*et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:14-cv-00274-SEB-TAB — **Sarah Evans Barker**, *Judge.*

ARGUED JUNE 1, 2018 — DECIDED SEPTEMBER 13, 2018

Before RIPPLE, KANNE, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* More than twenty current and former employees at the ConAgra microwave popcorn plant in Rensselear, Indiana sued various manufacturers and suppliers of butter flavorings that contained the chemical diacetyl, which if inhaled can cause a respiratory disease called "popcorn lung." All defendants were dismissed except Givaudan Flavors Corporation ("Givaudan"), a long-time supplier to

the plant, which faced claims under Indiana product liability law for strict liability, failure to warn, negligence, and design defect.

Givaudan moved for and eventually received summary judgment in full. The employee plaintiffs appeal, contending that the district court erred in reviewing the evidence and applying the law. Summary judgment for the flavor manufacturer Givaudan is proper on many of plaintiffs' claims, but not that Givaudan failed to warn plaintiffs that its products contained a dangerous substance. Whether an exception to that duty to warn—the sophisticated intermediary doctrine— applies to the employer ConAgra and exonerates Givaudan is a fact question, so we remand for trial on that claim.

## I. Background

As we review summary judgment in favor of the movant Givaudan, we consider undisputed facts, all reasonable inferences from undisputed facts are drawn in favor of the non-movant employees, and we view disputed evidence in the light most favorable to the employees. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weigle v. SPX Corp.*, 729 F.3d 724, 730 (7th Cir. 2013).

### A. *Factual*

The employee plaintiffs are all current or former workers at the Orville Redenbacher microwave popcorn plant in Rensselaer, Indiana. Their employer is or was ConAgra (a division of ConAgra Snack Food Group, not a party to this case). The

employees worked at ConAgra when Givaudan[1] manufactured and supplied to ConAgra butter flavorings containing diacetyl, an organic additive with a buttery flavor. In the early 1990s, Givaudan began supplying these flavorings with diacetyl to ConAgra for use in its plants, and by the mid-2000s Givaudan had sold these flavorings to ConAgra for use at its Rensselear plant.[2]

Exposure to diacetyl, the employees allege, resulted in their developing respiratory illnesses. When inhaled, diacetyl can cause *bronchiolitis obliterans*—commonly referred to as "popcorn lung"—the inflammation and obstruction of the smallest airways of the lungs. Symptoms of this disease include a dry cough, shortness of breath, wheezing, fatigue, and can lead to worse personal injuries.

In support of their claims, the employees have offered opinions of various expert witnesses. An occupational physician opined that the levels of diacetyl in the air at the Rensselear plant when plaintiffs worked there likely caused *bronchiolitis obliterans*. Another doctor examined the plaintiffs and diagnosed them with flavoring-induced *bronchiolitis obliterans* caused by exposure to diacetyl at the Rensselear plant. An epidemiologist and occupational physician who had reviewed the documentary and testimonial record opined Givaudan

---

[1] Givaudan Flavors Corporation is the successor to several predecessors-in-interest, including Tastemaker, Fries & Fries, Inc., Givaudan Roure Flavors Corporation, Givaudan Roure Corporation, Givaudan Corporation, and Roure Corporation. We refer collectively to the current company and its corporate predecessors as "Givaudan."

[2] Givaudan also makes diacetyl-free butter flavorings, and has done so since 1991.

should have known that diacetyl caused lung disease, as well as that Givaudan withheld from ConAgra the health risks of its butter flavoring.

"Popcorn lung" has been an issue in the microwave popcorn industry since at least the early 2000s when *bronchiolitis obliterans* was discovered at a microwave popcorn plant in Missouri (not owned or operated by ConAgra). In 2001, *The Wall Street Journal* published an article on that outbreak, and a federal health agency began a study to try to determine its cause. After the Missouri occurrence and the national press, ConAgra inspected its Rensselaer plant and concluded that its processes and ventilation systems were different. ConAgra wrote to its Rensselear employees about the differences between the plants, concluding that ConAgra's employees did not face the same risks as in Missouri. Still, ConAgra developed procedures for breathing tests for its employees, and also cooperated with the federal health study, including implementing the study's recommendation of ventilation improvements.

Givaudan knew about diacetyl and its harmful effects before the Missouri outbreak, the attendant publicity, and the federal health study. In the mid-1980s, Givaudan learned from its trade association that inhaling diacetyl was "harmful" and "capable of producing system toxicity." In the 1990s, three employees at Givaudan's plant in Cincinnati were diagnosed with *bronchiolitis obliterans*, and one died. In response, Givaudan retained an occupational physician who confirmed that the two surviving employees had contracted the disease. That physician recommended further investigation into the cause of the disease, but he was terminated. Givaudan was sued twice for claims of lung injury from diacetyl exposure.

Givaudan also responded to these diagnoses by promulgating procedures designed to reduce the risk of personal injuries from the use and handling of diacetyl. Those procedures required that "[w]henever liquid [d]iacetyl or a product where liquid [d]iacetyl is present is to be used, a respirator with chemical resistant gloves must be worn." Further, "[a]ny room containing [d]iacetyl in a liquid state must be labeled respirator required."

Givaudan likewise developed and implemented an employee protection program. To do so, Givaudan hired three physicians from the University of Cincinnati, who were required to sign confidentiality agreements. A pulmonary toxicologist testified it was "somewhat fair" to say he was unable to fully investigate the circumstances at Givaudan's plant. That doctor concluded Givaudan did not want to identify the precise nature of the problem, and did not want him to put anything in writing. An occupational physician stated he had narrowed the chemicals suspected of causing the outbreak "to a manageable list that could have been investigated," and he had offered the resources of the University of Cincinnati to conduct the study, but Givaudan did not give him the green light. Givaudan documents suggest the list of chemicals suspected as the cause of the *bronchiolitis obliterans* outbreak was narrowed to three, including diacetyl. One of these physicians testified that Givaudan limited the resources used to discover the cause of the outbreak, and that he was under pressure to not let employees know of any danger.

The parties dispute what information the flavor manufacturer Givaudan gave to the employees' company ConAgra about diacetyl and how it should be handled. Federal Occu-

pational Safety and Health Administration regulations re-
quire chemical manufacturers such as Givaudan to evaluate
and to classify each product sold and to provide with the
product a "material safety data sheet." 29 C.F.R.
§ 1910.1200(g)(5) (2018). Data sheets accompanied Givau-
dan's shipments of butter flavoring containing diacetyl to
ConAgra. Those sheets did not disclose how much (or even
if) diacetyl was present in certain flavors, as Givaudan con-
sidered that information a trade secret. The data sheets did
not include warnings that inhalation of fumes from butter fla-
vorings made with diacetyl could cause permanent lung in-
jury or *bronchiolitis obliterans*. While Givaudan informed
ConAgra generally that inhalation of the butter flavoring
could be "irritating to nose, throat, and lungs," Givaudan also
stated on the sheet that the flavoring had "no known health
hazards."

Givauagan supplemented the language in the material
safety data sheets over the time it sold butter flavorings to
ConAgra. Givaudan added that "ventilation meeting accepta-
ble standards was recommended," but it did not say employ-
ees handling the flavoring with diacetyl should wear respira-
tors, unless they were responding to spills or leaks. For "per-
sonal protection," the material safety data sheet stated, "res-
piratory protection is not normally required" in well venti-
lated areas, although in confined or poorly ventilated areas or
if material is toxic by inhalation, "the use of approved respir-
atory protection is recommended."

Givaudan's material safety data sheets did not state that
the flavorings were hazardous. Givaudan's toxicologist has
admitted that OSHA required Givaudan, for any flavor con-
taining more than one percent of a hazardous chemical, to list

in the material safety data sheet any health hazards and to give safety instructions for that chemical. Givaudan sold ConAgra five butter flavorings which contained more than one percent diacetyl.

While diacetyl was not listed on the material safety data sheets, ConAgra was aware that Givaudan's butter flavorings contained the additive. ConAgra was not aware, however, of all the components of the butter flavorings and the levels of diacetyl they contained. ConAgra's representative testified ConAgra understood the butter flavorings bought from Givaudan were safe for its workers. ConAgra expected that "flavor companies would disclose all the hazard information that they possessed about flavors that were being provided to ConAgra," and ConAgra relied on "flavor suppliers to tell if there was a particular hazard that could happen to" their employees. ConAgra represented to its employees that it strictly followed ingredient manufacturers' instructions for the handling and use of all ingredients.

**B**. *Procedural*

The employees brought a multiple count complaint in Indiana state court asserting Givaudan (and other defendants since dismissed) were liable for their injuries based on (1) strict liability for providing a defective product, (2) failure to warn about the butter flavoring causing respiratory disease, (3) common law negligence, and (4) defective product design, under both Indiana common law and the Indiana Product Liability Act ("the Act"), IND. CODE § 34-20-1-1 through § 34-20-9-1. The defendants removed the case to Indiana federal court under diversity jurisdiction; 28 U.S.C. §§ 1332, 1441. Indiana law governs all of plaintiffs' claims. *Erie*

*Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 831 (7th Cir. 2015).

First, the district court granted summary judgment to Givaudan on plaintiffs' claims for strict liability, negligence, and failure to warn. Some months later,[3] the district court granted summary judgment to Givaudan on plaintiffs' design defect claim.[4]

## II. Discussion

### A. *Standard of Review*

We review de novo the district court's grant of summary judgment, which is proper only if there is no genuine issue of material fact. *Piltch v. Ford Motor Co.*, 778 F.3d 628, 631 (7th Cir. 2015). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. Summary judgment is proper only "if the admissible evidence considered as a whole shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (quoting FED.

---

[3] The Honorable Larry McKinney presided over this case through the district court's June 1, 2017 decision and order granting summary judgment on the claims for strict liability, negligence, and failure to warn. After Judge McKinney passed away, the Honorable Sarah Evans Barker presided over the case and issued the October 18, 2017 decision and order on the remaining claim of design defect.

[4] In its October 18, 2017 decision and order the district court also denied the plaintiffs' motion to reconsider the district court's June 1, 2017 summary judgment order.

R. Civ. P. 56(a)). The nonmovant bears the burden of demon-strating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008).

**B.** *Failure to Warn, and the Sophisticated Intermediary Doctrine*

In Indiana, when a user or consumer sues a manufacturer for physical harm caused by a product, the Act governs the case regardless of the legal theory. *Piltch*, 778 F.3d at 632 (cit-ing IND. CODE § 34-20-1-1). Under the Act, a plaintiff must es-tablish that "(1) he or she was harmed by a product; (2) the product was sold 'in a defective condition unreasonably dan-gerous to any user or consumer; (3) the plaintiff was a fore-seeable user or consumer; (4) the defendant was in the busi-ness of selling the product; and (5) the product reached the consumer or user in the condition it was sold." *Id*. "The Act provides that a plaintiff can satisfy the second element–that the product was defective–by showing one of the following: a design defect, a manufacturing defect, or a failure to warn." *Ritchie v. Glidden Co.*, 242 F.3d 713, 720 (7th Cir. 2001) (citing *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997)).

"[I]n an action based on … an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in … providing the warnings or instruc-tions." IND. CODE § 34-20-2-2. Under Indiana law, there is a duty to warn reasonably foreseeable users of all "latent dan-ger[s] inherent in the product's use." *First Nat'l Bank & Tr.*

*Corp v. Am. Eurocopter Corp.*, 378 F.3d 682, 690 (7th Cir. 2004)
(quoting *Taylor v. Monsanto*, 150 F.3d 806, 808 (7th Cir. 1998),
*overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965
(7th Cir. 2013)); *Nat. Gas Odorizing*, 685 N.E.2d at 161 ("[A] la-
tent danger will, without more, cause the product to be un-
reasonably dangerous as marketed.") The duty is to warn of
the hidden danger itself, or the risks from a recognized dan-
ger that far exceed that contemplated by the ordinary con-
sumer. *Am. Eurocopter Corp.*, 378 F.3d at 690.

For the employees to show that the butter flavorings were
defective under the Act and to prevail on their failure to warn
claim, they must show Givaudan had a duty to adequately
warn about a latent dangerous characteristic, and Givaudan
breached that duty by failing to so warn. *See Nat. Gas Odoriz-
ing*, 685 N.E.2d at 161. Rather than Givaudan breaching the
duty, the district court ruled that Givaudan discharged its
duty to warn by reasonably relying on ConAgra, the plain-
tiffs' employer, to warn them about any dangers from diace-
tyl.

The duty to warn usually cannot be delegated, although
Indiana law recognizes an exception to this general rule,
called the sophisticated intermediary doctrine. *Id.* at 163 (cit-
ing RESTATEMENT (SECOND) OF TORTS, § 388). The doctrine has
three requirements: "(1) the product is sold to an intermedi-
ary with knowledge or sophistication equal to that of the
manufacturer; (2) the manufacturer adequately warns this in-
termediary; and (3) the manufacturer can reasonably rely on
the intermediary to warn the ultimate consumer." *Am. Eu-
rocopter Corp.*, 378 F.3d at 691. Courts interpreting Indiana law
have enumerated additional factors to be considered when
deciding if the sophisticated intermediary doctrine applies:

>[T]he likelihood or unlikelihood that harm will occur if the [intermediary] does not pass on the warning to the ultimate user, the trivial nature of the probable harm, the probability or improbability that the particular [intermediary] will not pass on the warning and the ease or burden of the giving of the warning by the manufacturer to the ultimate user.

*Nat. Gas Odorizing*, 685 N.E.2d at 163 (brackets in original) (quoting *Dole Food v. North Carolina Foam Indus., Inc.*, 188 Ariz. 298, 303 (App. 1996)); *see also Ritchie*, 242 F.3d at 724; *Am. Eurocopter*, 378 F.3d at 692.

Whether a manufacturer has discharged its duty under the sophisticated intermediary doctrine is "almost always a question for the trier of fact." *Ritchie,* 242 F.3d at 724; *Am. Eurocopter*, 378 F.3d at 692 ("In general, summary judgment should not be granted in favor of a manufacturer based on the sophisticated intermediary doctrine.") (citation omitted); *see also Hathaway v. Cintas Corp. Svcs., Inc.*, 903 F. Supp. 2d 669, 676 (N.D. Ind. 2012) (citation omitted); *Nat. Gas Odorizing*, 685 N.E.2d at 164 ("Whether a manufacturer has discharged its duty under the sophisticated intermediary doctrine is almost always a question for the trier of fact.") This admonition follows from the fact-bound inquiries the parties litigate: What was the knowledge or sophistication of the intermediary? How did that knowledge or sophistication compare with that of the manufacturer? Were warnings given, and if so were

they adequate?[5] What harm could occur if warnings were not relayed, and how much? What is the ease or burden of the giving of the warning? Was it reasonable for the manufacturer to rely on the intermediary to warn the ultimate users of danger? A jury, the archetypal determiner of "reasonableness," usually makes those decisions,[6] although this rule has exceptions. *See Am. Eurocopter Corp.* 378 F.3d at 691–93; *Taylor*, 150 F.3d at 808–09; *Hathaway*, 903 F. Supp. 2d at 675–78.

---

[5] "In general, the adequacy of the warning is a question of fact for the jury." *Am. Eurocopter Corp.*, 378 F.3d at 691 (citing *Nat. Gas Odorizing*, 685 N.E.2d at 161).

[6] *See* RESTATEMENT (SECOND) OF TORTS § 388, cmt. n, which notes the reasonableness question proper for the jury:

> Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. *The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.* All sorts of chattels may be supplied for the use of others, through all sorts of third persons under an infinite variety of circumstances. This being true, it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe.

(Emphasis added.)

The employees' failure to warn claim focuses on Givaudan's manufacturing and supply of butter flavorings, their accompanying material safety data sheets, and the lack of warnings that the flavorings contained diacetyl which can cause respiratory disease. As a result of Givaudan's failure to adequately instruct and warn of the dangers of diacetyl, the employees contend Givaudan's butter flavorings were defective and unreasonably dangerous when put to their reasonably anticipated use. Givaudan responds that the district court correctly granted it summary judgment because it relied on the employees' sophisticated and knowledgeable employer, ConAgra, to warn its employees of any dangers associated with Givaudan's butter flavorings. Givaudan asserts its material safety data sheets sufficiently acquitted its responsibilities about the use and handling of diacetyl. Givaudan maintains ConAgra knew everything Givaudan did.

The district court concluded on summary judgment that the duty to warn had effectively passed from Givaudan the flavor manufacturer to ConAgra the employer for two reasons: (1) "neither Givaudan, nor its hired professionals, nor its trade association discovered any connection between respiratory problems at flavoring plants and diacetyl in the 1990s" and (2) "ConAgra knew as much if not more than Givaudan with respect to the danger of butter flavors."[7] But in arriving at these reasons, the district court did not always adhere to the rule that in considering a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Anderson*, 477 U.S. at 255; *Sojka v. Bovis Lend*

---

[7] 2017 WL 2378258 at *10–*11.

*Lease, Inc.*, 686 F.3d 394, 397 (7th Cir. 2012). Factual inferences were made contrary to the employees' evidence.

In its first reason—that Givaudan did not discover any connection in the 1990's between employees' respiratory problems at its plants and diacetyl—the district court failed to properly account for the employees' evidence. This included the occurrences of *bronchiolitis obliterans* at Givaudan's plant, the resulting injuries to Givaudan employees, the investigation of the outbreak, and the development and implementation of an employee protection program at Givaudan related to the outbreak.

Givaudan responds that its 1990s investigation related specifically to diacetyl, not butter flavorings. That characterization does not give full weight, though, to what transpired at Givaudan's predecessor companies, and the policies and procedures Givaudan adopted as a result of the *bronchiolitis obliterans* outbreak. Those policies and procedures governed the use and handling of diacetyl, and were designed to reduce the risk of personal injuries. The district court saw no difference in these policies for liquid diacetyl, and diacetyl in a mixture, such as included in butter flavoring. Givaudan bets heavily on this distinction as relieving it from having to pass on its knowledge from the 1980s and 1990s to ConAgra. But while a jury could find that the policies Givaudan instituted applied to only pure liquid diacetyl, a jury also could read the policy to apply to mixtures ("or a product where liquid diacetyl is present"). That the policies could be so read renders this a fact question not for summary judgment. Givaudan pushes back, seeing a distinction in the procedures for raw ingredients versus for a mixture, and proclaims a sophisti-

cated intermediary would know the difference. Such an intermediary cannot know such a difference, though, if Givaudan does not relay the quantity of the substance to ConAgra. Givaudan maintains this information is a trade secret and it chose not to include that information in the material data safety sheets.

Also on this first reason, the district court's conclusion does not fully account for Givaudan cutting short the work done by the physicians whom it retained to study the *bronchiolitis obliterans* outbreak in the 1990s, as well as Givaudan placing restrictions on these physicians' work and its documentation. A jury could reasonably conclude that since then Givaudan has known of diacetyl's dangers, and the need to protect its own employees and the users of its products.

The district court's second reason for applying the sophisticated intermediary doctrine was that "ConAgra knew as much if not more than Givaudan with respect to the danger of butter flavors." The parties pull and tug on this question, Givaudan citing information it believes ConAgra knew or should have known, and ConAgra contrasting what it knew from Givaudan with what ConAgra found out later. The record, viewed through the proper lens, reveals factual disputes and discrepancies between what Givaudan knew and ConAgra knew.

This second reason incorrectly relied on Givaudan's view of the evidence, rather than the employees'. The only source cited for some of the critical information related to ConAgra's alleged knowledge of flavoring-related problems was Givaudan's interrogatory answers. Some information, such as ConAgra's size and sophistication, does not even relate to ConAgra's knowledge of the dangers of diacetyl. By failing to

credit evidence that contradicted its key factual conclusions, the district court improperly "weigh[ed] the evidence" and resolved disputed issues in favor of the moving party, *Anderson*, 477 U.S. at 249, inappropriate at the summary judgment stage.

On this second reason, the district court also did not view the employees' evidence in a light most favorable to them. Givaudan had received information from its trade association about diacetyl's harmful effects. Givaudan had suffered its own outbreak of *bronchiolitis obliterans*. Givaudan had hired scientists to investigate who narrowed the cause of the outbreak to three suspected chemical compounds, one of which was diacetyl. Injuries and a death among its employees resulted in Givaudan implementing its own policies aimed specifically at diacetyl. From these facts, a jury could conclude that Givaudan knew more than ConAgra about diacetyl and its harmful effects, the decision point as to whether or not the sophisticated intermediary doctrine applies.

Another example of differing knowledge between Givaudan and ConAgra is when employees should, or need not, use a respirator when handling diacetyl or products containing diacetyl. Givaudan contends "there is no evidence to suggest that the respirator requirement was implemented to prevent lung disease." To Givaudan, "the procedures were implemented months *before* Tastemaker first discovered that it had any employees with breathing issues and only to prevent eye irritation, not lung disease." But the evidence on which Givaudan relies is from an individual who cannot place the implementation of the policy before the *bronchiolitis obliterans* outbreak, and who had no first-hand knowledge of the reason for the policy.

An additional reasonable inference for the employees rejected by the district court was in the memoranda ConAgra sent its employees following the *bronchiolitis obliterans* outbreak in Missouri. ConAgra attempted to reassure its employees that Rensselaer had different handling procedures and ventilation, so such an outbreak would not be repeated in Indiana. A reasonable inference from the memoranda is that ConAgra concluded there was a ventilation problem at the other company's Missouri plant, not with Givaudan's butter flavoring. The district court rejected this inference as implausible, but a jury makes that call.

Given this view of the evidence, the sophisticated intermediary doctrine does not fit. ConAgra is not bound by the same regulations as Givaudan, as an employer can rely on the material safety data sheets provided by the manufacturer. ConAgra relied on the warnings and safe handling instructions in Givaudan's material safety data sheets. Givaudan knew this. Givaudan did not share with ConAgra the possibility that diacetyl could be the source of *bronchiolitis obliterans* among Givaudan's workers.

These examples rebut Givaudan's contention that while Givaudan supplied ConAgra's Rensselear plant with butter flavorings containing diacetyl, ConAgra had the same information as Givaudan. A jury, rather than the district court by summary judgment, should resolve these factual disputes about what the manufacturer knew versus what the employer knew, and thus whether the employer was a sophisticated intermediary.

Now summary judgment is not precluded in all cases with a defense that the sophisticated intermediary doctrine releases a manufacturer. But Givaudan's attempts to analogize this case to those precedents fail.

Like the helicopter manufacturer and the helicopter passengers in *American Eurocopter*, Givaudan contends it and ConAgra had the same level of knowledge of the possible harm. Yet as noted, genuine and material factual disputes exist about the parties' relative knowledge of diacetyl and the butter flavoring. *American Eurocopter* also involved unique facts: business executives had been warned explicitly and repeatedly from exiting a helicopter while the rotor blades were in motion, yet they insisted on so disembarking. 378 F.3d at 693. Here, ConAgra did not warn its employees that inhaling diacetyl could cause permanent lung damage. Unlike in *American Eurocopter*, the ConAgra employees did not refuse to wear a respirator or other items of personal protection following an explicit or repeated warning, as they could not reject a warning they were never provided.

Another decision Givaudan relies on, *Taylor*, also differs materially. In *Taylor*, employees of a corporate user of chemicals sued their manufacturer alleging failure to warn (and other theories). The manufacturer raised the sophisticated intermediary doctrine. We noted "Indiana courts have in the past taken a broad, multi-factor view of the level of sophistication required under the 'sophisticated intermediary doctrine.'" 150 F.3d at 809 (citations omitted); Unlike the differences in knowledge between ConAgra and Givaudan, in *Taylor* the user of chemicals gave their manufacturer individualized specifications, and the user had vast in-house expertise and had participated in federal and industry task forces and

committees on the chemicals. *Id.* at 808–09. Other cases in which summary judgment was granted under the sophisticated intermediary doctrine are also factually distinguishable from this case. *E.g.*, *Hathaway*, 903 F. Supp. 2d at 676–78 (parties' written rental agreement expressly discharged suppliers' duty to warn).

Viewing the evidence in the employees' favor, and drawing justifiable inferences for them, a reasonable jury could conclude that Givaudan failed to discharge its duty to warn the plaintiff employees on the dangers of diacetyl. Thus, summary judgment should not have been granted to Givaudan on plaintiffs' failure to warn claim.[8]

### C. *Common Law Negligence Claim*

In its first summary judgment decision, the district court concluded that the employees' claim for common law negligence against Givaudan was subsumed by the Act, which applies to all claims "brought by a user or consumer." IND. CODE § 34-20-1-1. The employees submitted they were not "users or consumers" under the Act, relying on cases of distributors or "middle men" of products. Although Indiana courts have held that individuals who fell within these groupings were not "users or consumers," the district court concluded that the employees did not act as "middle men" or distributors.

---

[8] Both parties reference *Stults v. International Flavors & Fragrances*, 31 F. Supp. 3d 1015 (N.D. Iowa 2014), in which the district court determined that a reasonable jury could conclude that flavor manufacturing defendants withheld pertinent safety information from ConAgra. Because Givaudan was not a party to *Stults*, in which a consumer plaintiff sued, rather than an employee, and the case involved Michigan rather than Indiana law, the case was not persuasive.

According to the district court, because the employees were users of the butter flavoring, any claim against Givaudan, a manufacturer, must be brought under the Act.

On appeal, the employees raise the same argument, contending that "[w]orkers who come into contact with the product before it is sold to the public in general are usually not considered consumers." Again, the employees assert they are not end users, but work for an intermediary, and that their common law negligence claim survives.

The Indiana law the employees rely upon does not support their position, however. In *Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562 (Ind. Ct. App. 1986), a warehouse worker was injured while moving a case of beverages. The Indiana Court of Appeals noted cases had established that the phrase "user or consumer" in the Act "does not include intermediaries in the distributive chain." *Id.* at 588. The plaintiff in *Thiele*, therefore, was not entitled to the Act's benefits because "the legislature has required a 'sale' to a 'first consuming entity' before the protection afforded by the Act is triggered, and Robert Thiele's injury occurred before such a transaction took place." *Id.*

The other case employees note, *Keen v. Nestle Waters North America, Inc.*, 2012 WL 1365444 (S.D. Ind. Apr. 19, 2012), also involved an employee injured while moving beverages at a supermarket. *Id.* at *1. In *Keen*, the district court determined that the supermarket's employees were "middle men" employees, like the plaintiff in *Thiele*. *Id.* at *5; *Thiele*, 489 N.E.2d at 585.

Unlike in *Thiele* and *Keen*, ConAgra and its employees used the butter flavorings as an ingredient in ConAgra's

microwave popcorn. ConAgra was the first consuming entity—not a "middle man"—for further sale of butter flavorings to the public. ConAgra incorporated Givaudan's butter flavoring into its microwave popcorn which was sold to the public. ConAgra was a user or consumer within the meaning of the Act, as were ConAgra's employees, who fall within the Act and its definition of "user or consumer" as recognized in *Thiele*.

The Indiana Supreme Court has ruled that under the Indiana Product Liability Act "an employee of a 'consuming entity,' … falls under the definition of 'user or consumer' established in *Thiele*." *Butler v. City of Peru*, 733 N.E.2d 912, 919 (Ind. 2000). So the district court did not err by granting Givaudan summary judgment on plaintiffs' common law negligence claim which is preempted by the Indiana Product Liability Act.

**D.** *Design Defect Claim*

Under the Act, a plaintiff also can prove that a product was sold "in a defective condition unreasonably dangerous to any user or consumer" (IND. CODE § 34-20-1-1) by showing a design defect. *See Ritchie,* 242 F.3d at 720 (citing *Nat. Gas Odorizing, Inc.* 685 N.E.2d at 161). "[A] defective-design plaintiff must establish that the defective condition rendered the product 'unreasonably dangerous.'" *Weigle v. SPX Corp.*, 729 F.3d 724, 735 (7th Cir. 2013) (quoting IND. CODE § 34-20-2-1). "[D]efective-design claims sound in negligence, so a party alleging a design defect 'must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product.'" *Id*. at 734 (quoting IND. CODE § 34-20-2-2). To demonstrate a design defect under Indiana law, "the plaintiff must compare the costs and benefits

of alternative designs" and "show that another design not only could have prevented the injury but also was cost-effective under general negligence principles." *Piltch*, 778 F.3d at 632 (quoting *Pries v. Honda Motor Co.*, 31 F.3d 543, 545–46 (7th Cir. 1994)). This demonstration requires expert testimony because a lay jury would not be able to establish and compare the costs and benefits of a diacetyl-free butter flavor design with Givaudan's butter design containing diacetyl, or that an alternative diacetyl-free design was cost-effective.

In its second dispositive order, the district court granted Givaudan summary judgment on the employees' design defect claim. The district court noted how expert testimony is required on the topic of costs and benefits of alternative designs, and to show that another design could have prevented the injury and was also cost-effective. Because the employees provided "no expert testimony on the costs and benefits of a diacetyl-free butter flavor or that the diacetyl-free butter flavors that existed prior to 2007 were cost-effective alternatives under general negligence principles," the district court concluded that the employees had not met their burden on their design defect claim.

On appeal, the employees contend they have presented evidence to survive summary judgment on this claim. They assert the butter flavorings Givaudan sold were designed defectively because they contained diacetyl, and refer to their expert witnesses who opined that butter flavorings containing diacetyl caused this lung disease from which plaintiffs suffer. The employees also refer to Givaudan's expert witness who testified to the availability and use of diacetyl-free butter flavors since before Givaudan supplied products to ConAgra.

None of the evidence the employees point to shows that Givaudan's butter flavorings were defective. *See* IND. CODE §§ 34-20-2-1, 34-20-2-2. Instead, on this point the employees offer conclusory factual assertions, without explanation or supporting data. *See McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998) ("[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process") (citations omitted). The employees' evidence that alternatives to diacetyl existed before 2007 also does not prove Givaudan negligently designed the flavorings. *See Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 638 (7th Cir. 2006) ("mere existence of a safer product is not sufficient to establish liability"). Nor does their evidence show viable alternatives to diacetyl before 2007. The employees designated as an expert a senior flavor chemist at Givaudan who has worked at Givaudan making artificial butter flavors since the early 1990s who testified there was one butter flavoring without diacetyl. But the chemist did not testify that the flavoring was used for popcorn, he acknowledged diacetyl had uniquely potent butter flavor, and he said when Givaudan started reformulating flavors to eliminate diacetyl, the new products were "not … the same and [did] not taste the same."

Statistical evidence would have been helpful on a design defect claim like this: How many employees worked in the plant? How many worked with butter flavorings? How many have contracted the claimed disease, within the plant and throughout the country? The employees presented no such evidence.

The employees also have not come forward with evidence that at the time ConAgra was purchasing butter flavorings from Givaudan for the Rensselaer plant, diacetyl-free butter

flavorings, if used, would have prevented the employees' in-juries. *Cf. id.* at 637–38. In *Bourne*, the plaintiffs' expert failed to provide how a finder of fact could evaluate the frequency of injuries caused by the product, or calculate the extent to which risk would actually be reduced by the alternative designs, or justify the cost of those alternatives relative to the benefits of the alleged defective product. *Id.*

Here, the evidence the employees offer on frequency of harm is even less detailed than in *Bourne*. The senior Givaudan flavor chemist who testified Givaudan made a diacetyl-free butter flavor in the early 1990s did not testify about the costs or benefits of that product. The employees did not pro-vide evidence of an alternative, cost-effective butter flavoring design that would have prevented *bronchiolitis obliterans*. In fact, the employees weakened their position in the district court when they admitted many diacetyl substitutes have been linked to lung disease. Once they noted "diacetyl-substi-tutes may be just as harmful as diacetyl," and cited various studies. In the absence of such evidence, the employees' design defect theory fails, and the district court did not err in granting summary judgment to Givaudan on this claim.

### III. Conclusion

For these reasons, we AFFIRM the grant of summary judg-ment to Givaudan on the employees' claims other than the failure to warn, REVERSE the grant of summary judgment on the employees' duty to warn claim based on the sophisticated intermediary doctrine, and REMAND for further proceedings on that claim.